Good morning, Your Honor. Anthony Long for Mr. Jung Yong Li. Prior to November 28, 2009, the Commonwealth of Northern Marianas was not a part of the United States for immigration purposes. However, upon the enactment of the Consolidated Natural Resources Act of 2008, the Commonwealth became a part of the United States for immigration purposes. And at that point, nothing in that particular Congressional enactment made it criminal or criminalized for an alien who was in the Commonwealth on the effective date of the act to travel to Guam. Now, also we point out that 8 U.S.C. section 1325A, under which this case was prosecuted, does not criminalize an alien traveling directly from one part of the United States to another part of the United States. And that's what we have here. The information charges that my client was going to travel from the Commonwealth to Guam by boat. There is no allegation that the travel was going to go through international waters at all. And to the extent that is an essential element, and to the point that that is what makes this criminal, then it was imperative that that point be alleged in the complaint, or excuse me, alleged in the information. It was not. Now, you can help me out just with my geography. It's possible to go between the Northern Marianas and Guam without passing through international waters? Well, that's a factual, actually that's a factual determination, Your Honor. Yeah, I'm asking you that as a factual matter. Okay. I am unsure at this point. That was because my client, we entered into a conditional plea, and it wasn't a point that was actually submitted or contested at all from my client's perspective. However, we are aware that in a prior decision of this case, United States versus Paris, decided back in 1985, the court judicially said that, well, you travel through some point of international waters going from Guam to, excuse me, from Saipan to Guam. However, based on the Gowden case, we submit that went to the Supreme Court. That's an essential fact that only the jury can decide. Isn't that subject to judicial notice? It can't be disputed. I mean, you know, you look at the maps and treaties and, you know, international law and stuff like that and figure it out that way. Well, if it's an essential fact of conviction that is essential for it to make the act criminal, it can't be subject to judicial notice. And I think that's what the Gowden case holds. Well, what about, I mean, isn't the more important question, is it an essential fact? In fact, is it? Does it matter? We will submit that the government claims it is. I know. I'm asking you, does it matter? I don't think it matters. Okay. I don't think it matters at all. That, in some ways, seems to me to be the key issue here. Does it matter? Is going over international waters from one part of the United States to another part of the United States, assuming, as you say, that these are both parts of the United States now, is that an entry? For 25 purposes. We will submit no, because if it's a direct travel, no. Now, we will concede that if you were stopping at a foreign port, stopping at a foreign place in between that direct travel, yes, then conceivably it could be deemed an entry. But there are some old cases, I gather, holding that if you go from Alaska to Seattle or New York to New Jersey and both international waters, as you do it, that's not an entry. Is that right? That's correct. That's my understanding. If it's a direct travel, and that's what we have here, that's what's alleged here. So to that point, we believe that the acts engaged in by Mr. Lee are not criminal, and that's the key here, that there is nothing from any statutory enactment by Congress that criminalized that direct travel. Although, and this is the anomaly in your position, the INA has now written, does make clear, that you need to be admissible to do that, and if you're not, you can't go to Saipan. Well, what the INA says is that if an alien that, let's say, travels from Commonwealth to Guam, and if they don't have a proper entry, they can be denied entry or they can be denied admission or removed, but nothing that says doing that or making that travel is criminal and constitutes an illegal entry or an attempt to illegal entry. Nothing on that. There is no distinction of an alien traveling from Commonwealth to Guam as it is for an alien traveling, let's say, from Boston to Nantucket. There is just no distinction. Mr. Long, you're here on a plea of guilty, right? Yes, Your Honor. Conditional plea. Conditional plea, yes. When the judge, I don't know, was it Judge Munson? Yes, Your Honor. When the judge took the plea, went over the factual basis, did he go over anything about any of these facts that might be in dispute? For instance, did he go over whether or not there was international waters involved, whether or not your client was admissible into Guam, any of these matters? No, Your Honor, not by recollection. It wasn't covered in the plea? No, Your Honor. All it was was in the plea that just the terms, the basic terms that was laid on the information. No other facts were going into or at all with respect to that matter.  He boarded a boat in Saipan or wherever it was in the Marianas and attempted to go to Guam. Yes, and entered a place other than that designated by a custom agent. That was it. That was the extent of the factual basis for the plea. Yes, Your Honor. Thank you again. At this point, my time is up unless the court answers. Thank you very much. Thank you. Good morning, Your Honors. Sean Frank on behalf of Ms. Wei-Kun Zhang. Okay. Now, your co-counsel just took six minutes, so I'll take judicial notice that it was only five. That's fine. And I doubt I'm going to need the full five minutes because he covered much of the ground that I anticipated covering. Now, did your client also plead guilty? Conditional plea as well, Your Honor. And Mr. Berline, we're saving until the end because he's also got some trial issues he has to deal with. Okay. His client was at trial. I think the court hit the nail on the head. The issue that we're dealing with here is does the defendant's attempt to enter Guam by boat from Saipan constitute a voyage from a foreign port or place? And I think there's plenty of you referred to older cases. I believe we're talking about Klassen and his progeny that specifically found that it's not an entry where one goes to sea on board an American vessel from a port of the United States and returns to the same or another port of this country without having been in any foreign port or place. So essentially, I mean, what this really seems like is maybe Congress kind of screwed up because it amended the INA with regard to invisibility in this regard, but it didn't amend 1325. So you have something of an anomaly because there's no other circumstances, I understand, where somebody has to be admissible for INA purposes but doesn't enter for 1325 purposes. I think we made that clear in our reply that there appears to be a problem with the amendments that they made. They didn't seem to consider this criminal aspect of it. And, of course, as a defendant, to be blunt, that's really not our issue. Your answer is that's their problem. They can fix it. Yes, ma'am. Yes, ma'am. I think you referred to some cases dealing with passage to Alaska from Seattle. I think the Cabocon court dealt with talking about all the various issues we'd have to deal with if we made passage over or through international waters from one U.S. port to another. But Cabocon, strangely enough, well, the statute says nothing about entry. They talk about importation, right? Right. Which is apples and oranges to a large extent. And that was the statutory term being interpreted in Cabocon, but that's not the term involved here. Right, sir. Here, I think, as Judge Berzon pointed out, the key term seems to be entry. Right. Entry, and I think the other key term is foreign port or place to use to help us define what we mean by entry. But that's not in the statute anymore. Foreign port or place? No, ma'am. That comes from case law, defining the term entry. Tell me if I'm right about this. It came from case law, then it was in the statute, then it was taken out of the statute. And you're essentially saying that the fact that it was taken out of the statute doesn't matter because we're just back to the original case law. I think, again, we're talking apples and oranges. It was taken out of the civil aspects of the statute. It's not taken out of the charge my client faces. Enter is the key term in the information of my client. But there's no definition in the INA of enter anymore. There is not, but the term wasn't changed for purposes of criminal prosecution. But the term entry is used over and over again in the INA and has been construed many, many times by the courts, right, including the Supreme Court. In Claussen, exactly. And that's exactly what I'm saying. I think that we've got plenty of cases that have defined this term precisely for these sort of purposes and talks about, I think Cabocon talked about the absurd results that we'd reach if we tried to define it otherwise. I believe Your Honor is from Los Angeles. Twenty-six miles across the sea is Santa Catalina. If we determined that that was international waters, that two miles, right, that's 12 miles and 12 miles, then we'd be dealing with issues related to exactly like this for going from Newport Beach to Catalina. And the same sort of thing here in Hawaii. We were going to go from, I believe, Maui to the Big Island or Oahu to Kauai. We're traveling through international space, but we're going from American port to American port. I'd just submit that, I'm going to use my time up, but I'd submit that those rulings are sound and they're squarely on point for purposes of defining this language, and I'd ask the court to follow those. Thank you. Okay, thank you. Good morning, judges. My name is Bruce Perline.  I'd like to adopt my co-counsel's, my colleague's arguments, but I'd also like to talk about some of the trial issues. Before you go, let me ask this. So you went to trial, jury trial? Bench trial, Your Honor. So did the instructions define the term entry for the jury or was that not an issue? Why not? The information says entry, right? Yes. So everybody knows what entry is, so you don't have to define it for the jury. Yes, again, it was a bench trial. It was a bench trial? Yes, it was a bench trial, so we didn't have any jury instructions. All right, so Judge Munson then on the bench trial, what did he base his ruling on? Did he explicate at all on the record his findings? No, not in great detail, Your Honor. He found guilt because of a substantial step, that they found him on the boat, and that there was no entrapment. And it was clear they were going to Guam, or they had the intent to go to Guam. Not with my client, no, Your Honor. On the conditional plea, I believe that was part of the conditional plea that they admitted specific intent. Not in my case, Your Honor. All right. And that brings me to the first issue, sufficiency of the evidence here. There were two people that testified. One was tangential about CMI immigration documents. The main witness was Erfolmatha Grihan, which was the ICE agent that pretended to be the experienced captain from Guam. There's a lot of problems with that. But he was what, an informant or an agent or what? He was an ICE agent, Your Honor. He conducted several meetings. Initially a principal, Jiang Li, came to him and said, you know, I have some people that want to go to Guam. And so he started conducting these meetings. And then he offered an authentic Guam identification card on one of the meetings. So people started coming to these meetings. The problem was, is Agent Mataguihan does not speak Chinese. My client does not speak English. They have a communication problem. What they did is they used a translator. But the translator they used was another principal target. Her name was Xing Cheng. She was related to the other principal, Jiang Li. She was the only translator in the both meetings that my client attended. Did she testify at the trial? No. Did not testify. So the agent testified as to what she told him. Not even that, Your Honor. What happened is the government admitted a very small transcript. You can see that at Appellant's Excerpt to Record 151 to 156, Your Honor. And it lays out what they did is they said, okay, the Agent Mataguihan said this, and then it was transferred here. I put some of that in my brief. It shows that it was grossly inaccurate. How did you do that? Did you have a tape of the Chinese? How did you know what the Chinese was? You mean how did we know about the translation? Yes. It was on a videotape. I see. So you had the Chinese and you had the English. Right. They were both in the same room, so Agent Mataguihan would speak, and then it would be allegedly translated by Ms. Chen. The problem was Ms. Chen was conflicted in part of the conspiracy, if you will, with the other principal, Jiang Li. Well, what's your point, that she had a conflict of interest or that her translation was inaccurate or both? Both. It was grossly inaccurate, and you can see that by the translation. But why isn't your easier point? I'm sorry. Did you put in any independent evidence of the inaccuracy? It's absolutely patently clear. You mean it's plain on its face? It's absolutely patently clear in the transcript. Give me an example as to how it's clear that it was a mistranslation. I mean, there's plenty of them. For one, Agent Mataguihan on a couple times speaks for maybe 20 seconds, and actually the translator just says, Okay, because Agent Mataguihan is dealing with a large number of people and he's not paying attention, nor does he know what the translator would say anyway. And when she did translate, it was grossly inadequate. You know, Agent Mataguihan would speak for a very long time, and she would just say, Yeah, pack some things after he would go off on a very long. So you can't, I don't understand how you introduced in the trial what the Chinese that she spoke as a translation actually said. Yes. How did you do that? We actually stipulated to that very small part of the translation, Your Honor, that that was inaccurate. I mean, as far as what was said in that very small portion, that was handpicked by the government. So my assumption is that's as best as it got. What? Isn't your other argument essentially that nobody, there was nobody who could testify that your client was actually even on the boat? Absolutely. Absolutely. And that goes to the sufficient. Except for the fact that he ended up arrested. So somehow or other he ended up arrested, but there was nobody to testify how that happened. Absolutely. Not only that, there was no evidence that he paid any money. There was no evidence that I believe that he did not receive the Guam ID card, the actual Guam ID card, nor is there any evidence, any reliable evidence, that my client was there on January 5th, early morning January 5th, where everybody was supposed to meet at a pre-boarding meeting place and board the boat. Did you make a motion for acquittal on that basis? Absolutely, Your Honor. And what was Judge Munson's response? He denied it. No, I mean, he didn't respond factually to that. No, but in his ruling at the end he said, I find that he was on the boat. Now, Agent Mataguihan said, oh, yeah, I know he was arrested, and upon cross I objected to that and said, yeah, he doesn't have foundation. We continued on, and on cross he absolutely admitted, clearly admitted that he had never seen my client on January 5th. The information came from some undisclosed other teen agent that he was arrested. All right. Now, let me ask you, you join in the arguments of the other defendants as to either the insufficiency of the information or that, you know, as a matter of law this is not a crime and all those kinds of legal arguments, right? Yes, Your Honor. And so if we dispose of the case on that ground, we don't have to reach a trial error, do we? I agree with that, Your Honor. All right. But otherwise, obviously I can see it's important. All right. I just want to know your opinion. Thank you. Yes. So, and that was the real, there was a lack of, a couple things, a lack of communication between the agent and my client and the rest of the group. Not only that, there was a lack of any observation of my client at the meeting. There's no testimony that he was paying attention, that he understood what was going on, whether his back was turned or he was speaking to somebody else. So when you put together a lack of communication and a lack of observation, you cannot come up with specific intent. You simply can't do it. And where was your client when he was arrested? I'm sorry, Your Honor? Where was your client when he was arrested? Looking at the record, nowhere. I don't know where they arrested him. I see. And so that's just not put into evidence. It's not in the evidence. Now, again, I don't, let me be clear. Agent Matiguihan said, I know he was arrested on the boat. But on cross, he had no personal knowledge of it whatsoever. Gotcha. Right. And except for that, we don't know anything. Exactly. So, again, you have no communication, no observation, no money exchanged. Well, let me ask you, was he at some of the earlier meetings? He was at two, Your Honor. One, he showed up an hour and a half late. There was only two meetings. It was very quick. Whereas this sort of scheme was explained to the people who were being transported. Agent Matiguihan would explain it in English. It was allegedly translated. Isn't this only an attempt case? That's right, Your Honor. So you're saying that evidence of attending the early meeting is not sufficient to constitute an attempt? Correct, Your Honor, on both. And, in fact, our position is it's not even enough to have a substantial step without more detail about what my client was doing at those meetings or if he said anything. You'll also see that Agent Matiguihan had offered the Guam ID card for $200 if they didn't want to go on the trip or free if they did go on the trip. But that's all the further it went. So the meeting had at least two purposes. Number one, it could be an informational meeting. And remember, the CRNA had just passed. So there's a lot of confusion about federalization. Am I allowed to legally go to Guam now? You know, the nonresident workers are very well educated and up-to-date on this stuff. So there could be some very logical and legal reasons why he was at this meeting. Can I ask a question? Yes. Were these people legally in Saipan? Or put another way, how did one get to be legally in Saipan at that point? And I'll let Mr. Shuler talk about that. But usually through a work contract. But the rules were different than to get into Guam. Yes, to my knowledge. At one time, the Northern Marianas, in effect, had their own immigration law, right? That's correct. Independently of the INA. That's correct. And it changed on November 28th with the CRNA. So he could have been legally in Saipan and not admissible in the United States? Absolutely. Absolutely. And you're not arguing that they actually had the right to travel. You're just arguing that it was not criminal for them to do so. Correct. Correct. Why don't we hear from the government? Okay. Thank you. We've taken you or allowed you to go somewhat over time, but you've saved five minutes for a rebuttal, which you have. Appreciate that. Thank you very much. Circuit Judges Tashima, Fletcher, and Berzon, may it please the Court. Aloha, half a day. My name is Kirk Schuler. I'm representing the United States. Mahalo also for allowing us to argue these three appeals together. There's really only one truly important consideration or fact for this Court in reference to the entry argument, and that is that, without a doubt, these three defendants were attempting to cross the border of the United States. Well, maybe two of them without a doubt. There may be some doubt as to the third. Yeah. Well, not even in that case, Your Honor. I would like to devote most of my time to the entry argument, but I will address Mr. Berline's. That makes sense to do it in that order. I agree. Yeah, yeah. So, really, the truly important fact is that they were trying to cross the border. The CNRA, that is the Consolidated and Natural Resources Act of 2008. But entry, but you can cross the border and not make entry. I mean, that's going from, you know, Seattle to Alaska, right? No, Your Honor. Crossing the border is the most important thing to an entry. Don't you think if you say take a boat or fly from Seattle, we'll say Seattle, to Anchorage, you cross the border, right? But you don't make an entry. Your Honor, I disagree with that. Do you mean there's an entry on a direct flight from Seattle to Anchorage? Well, now we're talking about a completely different situation. Right. There's at least three considerations here that are extremely important. You have travel by direct commercial flight, which you just referenced. Well, we'll say you go by boat. Okay, by boat, certainly there is an entry. Seattle to Alaska, there's international waters present there. Is that the way it's defined by the cases? Absolutely, Your Honor. This is the case that defines it, that that would be entry. Claussen v. Day, Mr. Frank, just referenced that case. That is a case where the Supreme Court of the United States, way back in the early case law, says a boat traveling in international waters is not a place within the United States. It references a boat in international waters. Yes, but it also says, as I understood what happened there, if you leave San Francisco, go into international waters and come back to San Francisco, you're not making an entry. Well, Your Honor, in that circumstance, you're leaving one part of a geographic part of the United States and coming right back to the same part. You're going through international waters. Absolutely, Your Honor. So what is your – so it matters if you go into a different place in the United States, if you go to the same place in the United States, even if you're in international waters, and you're not making an entry? Your Honor, I think there's many predicate considerations that this Court needs to consider when determining whether an entry from the CNMI to Guam. That is really the only question that is before this Court, whether traveling from the CNMI to Guam, international waters in between, and the immigration system in the CNMI is a world apart from the immigration system. But that's something else, though. You see, look, Klausen v. Day has this specific language. In order that there be an entry within the meaning of the Act, there must be an arrival from some foreign, farther place. And immediately before that, Your Honor, it defines a place as a boat in international waters. It's a sentence that precedes that by just a couple. It says a boat in a foreign – a boat, even if it's flying a United States flag, if it's in international waters. Wait a minute, wait a minute. Such a vessel outside the United States, whether on the high seas or in foreign waters, is not a place. Exactly, Your Honor. It's not a place within the United States. These defendants were going to be on a boat. They were going to be in international waters. It's undisputed that this was going to be international waters. That is not a place within the United States. Let me come back to an example that was given here. I know you've tried to put it to one side. Los Angeles to Catalina, 26 miles to the Island of Romance. I don't know if you know the song, but okay. We go across from Los Angeles to Santa Catalina. We cross through international waters. When you arrive at Santa Catalina, is that an entry? Your Honor, if we look solely at an entry, solely at an entry, not considering – I asked you a question. Yes, Your Honor. It is an entry. There would be a technical entry there. Now, okay, what's the word technical doing there? I'll ask it another way then. Okay, I've got an alien who goes on a day trip from Los Angeles. He's an illegal alien. He goes on a day trip from Los Angeles to Santa Catalina. You guys arrest him when he shows up in Catalina, and you prosecute him for illegal entry criminally. Not the question before us, Your Honor, but – No, that's the question I just asked you, though. I think it would be possible. You would have to look at intent, though, Your Honor. 1325, the only element is not entry. That's perhaps the only important element here because they've admitted all the others. But there's many elements to attempt an entry. Intent, an alien intending to make a surreptitious entry into the United States. That's important. In your example, I don't know if the government would – if that's really a thing that you could even know. But I'm not interested in surreptitious. I'm interested in the definition of entry. And it sounds like you're arguing that a trip from Los Angeles to Santa Catalina, when you arrive at Santa Catalina, that that's an entry for purposes of criminal law. What I'm arguing today, Your Honor, is that traveling from the Sinai to Guam is an entry. But there's crossing the border in both situations, Your Honor. We needed to distinguish those two. If we thought that Judge Fletcher's example was not an entry, how would this be an entry? Well, Your Honor, let's go back to the Sinai immigration system and how it differs from the immigration system in all other parts of the United States. On November 28, 2009, by congressional snap of the fingers, the Sinai becomes a part of the United States as it's defined in the INA. That means that all the people, the aliens that were there under Sinai immigration law, are now in the United States. You can't even really say that they entered the United States because just by the snap of the fingers, they're now present in the United States. But did they really enter there if they were there prior under the Sinai immigration law, which was significantly more lenient in allowing people to enter? Now, the other difference, in the Sinai now, you can enter the Sinai under much more easier circumstances than it is to enter any other part of the United States. And that is why there is Section 1182d7. It's part of the INA, which was amended by the Sinai. It says, okay, now that the Sinai is part of the United States, that doesn't mean that the aliens there or the travelers there that want to go to any other part of the United States can just automatically go there because their lawful presence, even if they're lawfully present in Sinai, it doesn't mean you can be admitted anywhere else. So this 1182d7 provision says that the United States has the authority to require aliens to seek admission to not only the mainland United States. So are you essentially asking us to read that section into the criminal section? No. I'm trying to see how you would get to the conclusion that the CNMI Guam transfer is different from another transfer. I understand you might want to argue that it's not different and they're all entries, but assuming that it's not an entry to go to Catalina Island or Nantucket or from Seattle to Alaska, the only way you could get where you want to go is by essentially reading the INA language that was put in at the time that CNMI became part of the United States into the criminal section. Your Honor, the INA has been read by this Court. The words entry, the definitions in the INA, it encompasses civil arenas and criminal arenas. This Court has said that we're not going to try to distinguish and make exceptions regarding civil and criminal arenas based on these definitions. The INA is one body of law. We have to try to interpret it as one body of law because Congress, what it said here in the INA has to be the same interpretation it said here. I'm not asking you to make distinct. Is the word entry used in the INA, relevant INA section? Yes, Your Honor. In 1182d7, this is the provision that says that aliens traveling from the CNMI to Guam have to seek admission to go into Guam. That specifically says the word enter. It says the word enter. The INA doesn't define enter anymore, but that 1182d7 says enter, and it says that you have to be admitted to go into Guam. Now, admission is defined by the INA, Your Honors. Admission is defined as a lawful entry. Now, this is a very important concept. If I could use that blackboard on the wall or the board there by the wall, you have entry, a type of Venn diagram. Entry is a big circle. Admission is within that big circle, and admission is a lawful entry. The INA talks about admission as a lawful entry. If you have to seek admission to go from the CNMI to Guam, it is predicated upon an entry. You cannot seek admission without an entry because admission is defined as a lawful entry. That is what Congress changed in 1996 with ERIRA. They changed, they removed the definition of entry. They said, oh, my, this is crazy how the courts are interpreting this, and what we're left with, we need to get rid of this entry definition. But not for this reason. For official restraint, Your Honor. Yeah. The doctrine of official restraint has largely been the one that has caused intellectual heartburn, I think, regarding entry. But that has nothing to do with this case. No, Your Honor. This is an attempt case. Judge Berzon, I think you were one of the judges that was on a panel, Rivera-Rell, that made it clear that an attempted entry is not predicated on official restraint. So what we're left with, the typical Board of Immigration Appeals definition of entry, you require a physical presence, crossing of the border with either inspection or the intentional evasion of inspection, and then the third element, official restraint. Well, you can throw out that third element. All you need is the crossing of the border and the evasion, which is present here. They've admitted, even the two defendants. What's your best case that holds that? Your best? Give me a citation on the case. Your Honor, my brief cites... Just give me your best case. Rivera-Rell, Hernandez-Herrera, I believe it's Leon Lombardo. I just want one case. Rivera is your best case? All right. Go ahead. What's your argument? In some, Your Honor, there is at least five Ninth Circuit cases in 2000, from 2000 to 2005, that say it is the act of crossing the border. What the defendants are trying to make you hold on to is this from a foreign port or place language that was in the INA until 1996. So it's your argument. And those cases had nothing to do, though, with crossing international waters, right? None of them? No, Your Honor. Right. So they're kind of irrelevant to this very distinct question, which is whether going into international waters and coming out of the international waters in a straight line is an entry. What is your position about the significance of having, for this variety of case, of having changed the entry definition? In other words, the definition that was in there was intended, it appears from everything we know, as a, to reflect the case law. Now, I understand you're reading Clausen somewhat differently. But the later cases read Clausen as foreign port or place, as did the statute. Then they took it out. What is the significance of that? Well, the significance is that there is no reason for this Court to now hold on to this specific language. Their argument is completely predicated on a foreign port or place. They have to have that language in order to win here. But even with that language, Your Honor, the argument is twofold. One, that language is no longer here. It doesn't require this Court to give specific congressional intent to that language because Congress doesn't have it anymore. Therefore, this Court would actually be legislating that into the definition of entry. I'm sorry. I may be a little slow here. You said we don't have this anymore? It's not in 1103, excuse me, 1101 Parent 13? No. Congress removed the definition of entry. Congress has not defined enter anymore. And that's from a foreign port. That's the pre-IOR language. Right. That was pre-IOR. 1996, no more. If it were correct that that language was in the first place simply codifying case law, it's a little harsh to say that we'd be legislating if we simply said, okay, that case law is still case law and we're going to follow it. Well, Your Honor, that's not in fact what happened. The earliest case law just recognizes that you have to come from the outside. And the earliest case law that I was discussing with Judge Tashima identifies a boat in international waters as a foreign place. I don't think it does, but we'll accept that for your argument. But, you see, I think Judge Berzon's point is you may be correct that IRIRA removed the definition of entry, but it didn't provide another definition. And you would think if it wants to overrule Supreme Court case law, it would put in no entry means X and not Y, as the Supreme Court said, right? They didn't do that. Well, Your Honor, what... Isn't that true though, Congress did not do that? Congress did use the word entry to define what immediately took the place of where entry was. Entry was defined... You're not answering my question. Congress didn't do that, did they? They did not provide another definition of entry. No, Your Honor. All right. But they did provide the definition of admission, which requires a lawful entry. And you have to be lawfully, you have to be admitted to go to Guam from the CNMI to Guam. You have to be admitted. Well, for certain purposes of certain statutes, I agree with that. And the INA must be read so that it's comprehensive and coherent. But also, you know, I mean, criminal laws might be read a little bit differently, right? If there's some ambiguity, then we have to. Your Honor, in here, I don't believe there is any ambiguity, because even at the time that Congress legislated the definition of entry, and this is in my brief, the legislative history, there is Congress telling the court it is the act of crossing the border. Normally, an entry occurs when one crosses the border. The exceptions to that were the Flutie Doctrine and the Official Restraint Doctrine. So, Your Honor, Circuit Judge Berzon, even if you use the words from a foreign border place, the government still wins, because a boat in international waters is still a place outside of the United States. Actually, you know, reading Clausen as we're sitting here, I think what they were really saying, even though it seems a little antique at this point, was that because it was an American vessel, he wasn't in a foreign border place. In other words, being on international waters was not being in a foreign place, as long as he was on an American vessel. That's pretty clear when you read the single paragraph carefully. Of course, I don't know how that plays out here, but that seems to be what they were saying. And also, what I want to bring the Court's attention to, and I have about three and a half minutes, so I do want to devote my time to the entry argument, but I do have some arguments for it. Okay, then answer this quickly. There's one question for me. Part of the argument, as Mr. Long and others made as well, whether or not international waters was crossed is, one, a fact, and, two, you know, there's nothing in the record on it, and, you know, it's not alleged in the information. What's your answer to all those arguments? Well, Your Honor, I know of very – I suggested you might take judicial notice, but he said no. I think judicial notice is a very prudent course. I know a very smart mother that took judicial notice in Perez. Circuit Judge Fletcher, I believe your relative, took judicial notice of that under Federal Rule of Evidence 201 to know that 31 nautical miles separates Rota from Guam. And, Your Honor, even in Cochabang, where the Court was divided in bank five to four, both sides took judicial notice of a nautical chart. And in Chiguangli, Mr. Berline's client, the government actually produced a nautical chart at trial. It was a chart almost as big as that TV there. It showed the islands. It showed the latitude, longitude, every second equals a nautical mile, Your Honor. It's not a question. Mr. Frank, even in his brief, his reply brief, acknowledges that there's 31 nautical miles between Rota and Guam. Judicial notice really isn't a concern for the Court, Your Honor. All right. Then what's your response to the argument that no one identified the Chiguangli who went to trial? Your Honor, it's false. The agent, the ICE agent, was an undercover boat captain. He was the guy that was taking all of these people to Guam. Chiguangli attended two meetings. At one of those meetings, the undercover boat captain actually met face-to-face with him, wrote down his biographical information. The video we presented at court showed that to Judge Munson. Secondly, the argument about the arrest, in the government supplemental excerpt of record on direct examination, I asked Special Agent Manteguiha, was the defendant Chiguangli one of the 23 that was arrested on the boat? Yes. The evidence is in the record. And then what happens on cross? Because the argument is on cross, he says, yeah, but I never saw him. Right. Is that what he said, I never saw him? Your Honor, what Special Agent Manteguiha was saying, I saw all of these people on the boat, he was there on the boat when all of these people... All right, come on, come on. What happened? I'll read it if you point me to it. Where in cross-examination does he say, yeah, but I never saw him? What are the words that he says? Your Honor, I've got the ER right here. Maybe you have the second point to me. If he says, yes, he was on the boat, but then on cross says, I never saw him, what am I left to conclude? I mean, how does he know he was on the boat if he never saw him? You're left with circumstantial evidence, Your Honor, which every case is based at least in part on circumstantial evidence. What the defense is asking you to find is the direct evidence to say that, oh, yeah, I saw him on the boat. No, Special Agent Manteguiha was there when all 23 individuals were on the boat, and he knows that the defendant, he was arrested with all 23 individuals on the boat. Well, but he didn't testify to any of that is my understanding. No, he did. All he testified, I'm sorry. I'm sorry, Your Honor. Did he testify that he knew that this guy was one of the people arrested on the boat? Yes, Your Honor. That's on page 18 and 19 of the government supplemental excerpt of the record. I asked, was the defendant one of those 23 that was arrested on the boat? Answered, yes. But then when he was asked how he knew that, he said because somebody else told him. Well, because he was there and because he was part of the arrest team with the agency. He doesn't, I mean, there was 23 individuals there. He was part of the. . . I mean, it seems like he could have established this. He could have said the only people who were arrested were the people on the boat. There was nobody arrested who wasn't on the boat. And how do I, and I, he was, how do you know he was arrested? You could give him records that show that he was arrested. But none of that was done, right? I mean, the only thing we have is him saying he was arrested on the boat and then how do you know because somebody told me. That's basically it. It's on page 137 at the top. Your Honor, again, I think the difference is the direct and circumstantial part here. There's no prohibition against circumstantial evidence satisfying. And the way I described it, it would have been circumstantial evidence beyond a reasonable doubt. But what is your circumstantial evidence other than the fact that he's in the courtroom, so at some point he was arrested, but we don't know that he was arrested on the boat. And how do we know he was arrested on the boat? The guy said he was arrested on the boat when you asked how he knew because somebody else told him that. Well, Your Honor, you also have the fact that this defendant has been at two prior meetings with all of these same individuals, that they were first at a pre-boarding site where all of these individuals. . . Even though he was there. Right. But this group of individuals that he has been with on two prior occasions in different hotel rooms, meeting with this captain, we have video evidence of all of that, video evidence that we presented at trial where this defendant is in those meetings. How many people were at those two meetings who were potential, I'll call them customers, and how many people were on the boat? I'm asking, was everybody at those meetings, did they end up actually being on the boat? Your Honor, and I'm not entirely sure if this is in the record, but if you'll permit, there was one that I know of, one that was at the meetings that did not attend. I cannot. . . Did you put anything in the record to show how many people were at that meeting? Your Honor, the videos. . . Every meeting was recorded, not by audio, but by video as well. And some of the videos, it makes it very clear. If you pan carefully across the room, you can count them. Do we know how many people were at those two meetings? Yes, Your Honor. It also showed the doors of the hotel room, the only way that they could have come in. So you see every alien or every individual that was coming through those doors. And I'm trying to figure out how strong the circumstantial evidence is from the fact that he was at those two meetings that he would have shown up on the boat. Do we know that only people in those two meetings were those who showed up on the boat? Well, again, I'm trying to make sure of what the record would say to that. I know Special Agent Manson-Greenhand testifying that we had these meetings. These are the 23 individuals that were at those meetings along with the translator. We were expecting $44,000 on the boat. That's what we got after cutting the smuggler a $1,000 discount. So $2,000 each times the 22, not including the lead smuggler, that would equal $44,000. So they were anticipating that many, and that's what they got. So, Your Honor, I think the circumstantial evidence is pretty clear that this defendant was part of this group throughout the whole planning stages and that the special agent testified that, yes, he was arrested on the boat. But we have no witness who actually did the arrest of this person? The government didn't present that, Your Honor. That's what I mean. On the record, we have no witness who says, I arrested this man on the boat. Other than Special Agent Manson-Greenhand, who was part of the arrest team. But he says, I never saw him. So, obviously, he can't say I arrested him. Yes, he recognizes him in court, of course, and then he recognizes him through the videos, of course. He was the captain. But the question is whether or not he was actually on the boat, and we have no direct evidence that he was on the boat and no direct evidence that he was arrested on the boat. Well, I think I would agree with Judge Munson that that circumstantial evidence of that, though, is sufficient. And that's what we're talking about. That's what I'm trying to figure out is how strong the circumstantial evidence is. Did Judge Munson make a specific finding? Did he make a specific – in response to the motion for acquittal, did he make a specific finding and give an explanation of why he thought there was sufficient evidence? You say he found that there was sufficient circumstantial evidence. Did he say that? Your Honor, this was a bench trial. In other words, I don't think Judge Munson stated specific findings in this case. As a bench trial, the rules allow the defense to ask for the judge to make specific findings. At the end of this bench trial, Judge Munson stated on the record the findings that supported his conclusions, but he didn't issue any written findings. So we would need to look back to the transcript. Well, what about on the motion for acquittal? Regarding the entry argument, Your Honor? No, regarding the sufficiency of the evidence. Well, that again would be in the transcripts during the trial on the Rule 29 motion. Well, is it your position that even though – assuming there's no evidence that the defendant who went to trial was on the boat, that the circumstantial evidence is still sufficient to support a conviction? Yes, Your Honor. Because he went to the meeting, you know, money changed hands and that kind of evidence. Do you think that's sufficient to support a conviction of attempt? Yes, Your Honor. This was a very large case. The government wanted to present it in a clear, concise manner. What I understood Justice Schema to be asking, and I'm not sure I understood your answer, is would it be your position is that even if they can prove he was on the boat, that just going to the meetings was an attempt? Your Honor, yes. That requires a substantial step. And step being what? Going to the meetings? The plannings, the preparations for all of it. Getting the Guam ID card in order to go to Guam. But it was possible to get the Guam ID card and not agree to go on the boat. It was certainly possible, Your Honor, but the evidence is clear that this person was arrested with this group. Well, I understand that, but I'm asking you a question of what if we didn't think that evidence was clear enough? Was being at the meeting and getting the Guam ID card sufficient to prove attempt? No, Your Honor. I wouldn't charge it in that case. Certainly not. There was one, as I stated, I think there was one that had attended but did not get on the boat with him. And you didn't charge that person? No. No, Your Honor. But here the evidence is clear that this person, this special agent, testified to that. That's in the supplemental excerpt of the record. Okay. So, Your Honors, I know I've gone over and your clerk's been generous with me. To sum it up, this is an excellent opportunity for this court to give a reasonable interpretation to the word entry. That's what I'm asking you to do and asking you to affirm the defendant's convictions. Thank you very much. Thank you. I'm not quite sure how the team wants to handle the rebuttal. You've got five minutes, but as you can see, we've not been terribly strict on this. We want to make sure we understand this case as best we can. Anthony Long, and I'd like to reserve for about two minutes, and then leave the time for Mr. Berline and if Mr. Frank would like some. You want to reserve or you want to use? Use. In our rebuttal, I'd just like to point out one thing, that the government tends to assert that what makes the conduct criminal was going through international waters. And if that's the case, then this court's decision under DuBose requires that essential fact to have been pled in the information. That was not done. All the information charges is traveling from Saipan to Guam, and it says nothing about international waters. So if that's the crucial fact that makes this criminal, it needs to be pled. It was not. What if we were to conclude it's unnecessary to plead that because everybody and his dog knows that you have to go through international waters and we can take judicial notice of the chart? Well, I don't think that. Then does that have to be charged? I think to give that credence, Your Honor, I think under what we look to is this court's unbunked decision in the United States versus Gatlin, 28 Fed 3rd 943, which states that essential facts, it goes to the guilt to innocence, they have to be determined by the trier fact and cannot be judicially decided. So to the fact is. Well, what about this approach? What about this approach? That, well, you don't have to charge travel for international waters because that's an inherent part of entry, and we charge entry. Well, entry, we can't necessarily international waters, what you say is an inherent part of entry. We say entry is, as defined by the law, is from a port or a place. Now, to the extent the government wants to claim that there was entry, they would, for purposes of 1325, then if they want to say that international waters is a foreign place, then what they have to say is that there was an attempt to enter Guam from international waters, not from the Commonwealth, which is a point in the United States. Yes, Your Honor. The government had another argument that they didn't really articulate that well, but it is essentially that because of 1A2, whatever the section is, subsection 7, saying that the admissibility provisions are applicable to any alien, and then says add who seeks to enter the continental United States or any other place, that for purposes that that use of enter has to mean, you would nullify the whole section if enter in that section meant from a foreign port or place. Well, as I understand that particular provision, that particular provision addresses the civil remedies portion of the immigration. I understand that, but it does use the word enter. That's correct. And to the point that 1325A uses the word enter, and there's case authority. If you interpreted enter the way you want to interpret it, wouldn't this section become a nullity because nobody would be entering the continental United States or any other place under the jurisdiction of the United States, i.e. Guam, because they would be not going across international waters? I'm leaving aside your indictment point, but if you were to read it so that foreign port or place doesn't include international waters, then aren't you just negating this whole subsection? Or else for some reason reading enter in this section different from enter in 1325? I'm not quite sure I'm following it, but to the extent that the government is arguing that 12, I think it's 82 or whatever, has changed the definition of meaning of entry for purposes of 1325A, we would submit that the enter has to be coming from someplace outside of. And to the extent that international waters, and we would go back to the third circuit in the Ramirez-Vera, and as this circuit somewhat implied in the Kakabong decision, is that the waters or the air is not necessarily a place. And to the extent that you have to enter, you have to come from someplace, but when you leave from the United States and you're going directly to the United States and you're not stopping anywhere else, we submit that there cannot be an entry under any definition of the term. I have to say that I'm puzzling in this argument, that you try to construe words to mean roughly the same thing if they're in the same area of legislation and so on, and 1182D7, the civil section, says, and it's applicable to any alien who shall leave Guam, Commonwealth of Northern Mariana, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States, it sounds as though, then, entry here takes place if you leave the Marianas and you come into Guam. That's correct. Am I reading that statute right? I think you're reading that statute right. However, that statute only provides a civil remedy. I understand that. But if entry here means leaving the Marianas and coming into Guam, and we don't have any more of the foreign border language or place language in the definitions, and the only thing we have in the criminal statute is basically entry, what's your strongest argument as to why I shouldn't read these two terms, and the civil and the criminal, not meaning the same thing? I mean, that's the sticking point for me. Yes. The point is that the aspect in the civil statute specifically gives an example of what it would deem to be an entry for purposes of the civil remedy. However, we all know that criminal statutes are to be strictly construed, and if Congress intended to make it criminal to engage in that same act, then it would have amended 1325A to provide the same provision, that if you travel from the Commonwealth to Guam without approval, and it doesn't work the reverse way, but if you seek to travel from the Commonwealth to Guam without prior immigration authority, then if that was to be a criminal penalty imposed, then the CRNA should have provided that specifically, or it should have amended 1325A to specifically provide that, just as it did on the civil remedies portion. So just to clarify something, your position would also entail the conclusion that if somebody flew from the Northern Marijuana Islands to San Francisco, they wouldn't be making an entry either. Correct. Yes. And finally, we'd just like to point out that to the extent I think this argument is made clear, there's a lot of confusion with the enactment of the CRNA concerning an alien being able to travel from the Commonwealth to Guam. And under the void for vagueness argument that's in our brief, we think that the rule of leniency would require that the charge not be enforced against the defendants in this case simply because it is so unclear or uncertain that it fails to provide clear notice to anyone. Thank you very much. Thank you. Now, come say what you need to say. Thank you. I'll be quick, quick as I can. The court's right. The one issue is the two meetings, one of which he was an hour and a half late for, sufficient to show that he had the specific intent to go to a place other than one that was designated by the United States. The government conceded that that's not enough. I'm sorry? The government conceded that it wasn't enough, that if they couldn't get him on the boat, that they lose. And it's clear on the record. If we look at what's clear, I mean, the question that seems to me the sticking point now is, is there enough circumstantial evidence that he was on the boat? And, you know, there's some. I mean, you know, he was at those two meetings late for one, I understand. The numbers seem to add up. I mean, why is the circumstantial evidence insufficient? Because the numbers don't add up, Your Honor. It's clear. Agent Matt DeGuihan only counted, he didn't count the money. He counted one bundle and then counted the bundles of money, so he guessed about the amount of money. He never counted the people on the boat, never. He didn't know how many people were on that boat. He was occupied with the two principals during January 5th when they came, when the boat was loaded, when everybody was supposed to meet there. And it's right here. You know, he talks about, I learned that he was arrested by other assigned arrest teams in the boat. And then I follow up, did you personally see my client get arrested on the boat? No, I did not. Did you ever see my client on the boat? No. Did you ever see my client in the first group that you put on the boat? No, it was dark. Did you see my client with any other group that got put on the boat? No. Any information that my client was arrested on the boat came from someone else, correct? Yes. And that's at 132 of the excerpts around. Well, you know, that's in the record now. He had information from someone else that they were on the boat. You didn't object to that as hearsay, did you? No, Your Honor. I objected. I made an objection prior. So it's evidence in the record that he has information from someone else that your client was on the boat. So that can be considered in terms of the sufficiency of the evidence, right? Well, yes, but prior to that, Your Honor, I did make an objection that when the government asked, because of your involvement with the investigation, are you confident that the defendant was arrested that day on ER 130 prior to that, he said, yes, I made an objection, lack of foundation, Your Honor. The court overruled it. I know, but you strung him along and made him answer a lot more questions after that. Yes, I wanted to make sure of that, but the problem was he had information from somebody else. That's in the record now. He knew that he had no personal knowledge about my client being on the boat or even at that place, and I didn't make that objection because I had made it prior. No, you made kind of that objection prior. I think that's about it. Again, there's no indication during those two meetings. There's no observation, and there is no communication. Okay, we got it. Thank you. Thank all of you for good arguments. The cases of United States v. Lee, United States v. Zhang, United States v. Lee, are now all submitted for decision.
judges: Tashima, Fletcher W. , Berzon